******************************************************

The "officially released" date that appears near the
beginning of an opinion is the date the opinion will be
published in the Connecticut Law Journal or the date it
is released as a slip opinion. The operative date for the
beginning of all time periods for the filing of postopin-
ion motions and petitions for certification is the "offi-
cially released" date appearing in the opinion.

All opinions are subject to modification and technical
correction prior to official publication in the Connecti-
cut Law Journal and subsequently in the Connecticut
Reports or Connecticut Appellate Reports. In the event
of discrepancies between the advance release version of
an opinion and the version appearing in the Connecti-
cut Law Journal and subsequently in the Connecticut
Reports or Connecticut Appellate Reports, the latest
version is to be considered authoritative.

The syllabus and procedural history accompanying
an opinion that appear in the Connecticut Law Jour-
nal and subsequently in the Connecticut Reports or
Connecticut Appellate Reports are copyrighted by the
Secretary of the State, State of Connecticut, and may
not be reproduced or distributed without the express
written permission of the Commission on Official Legal
Publications, Judicial Branch, State of Connecticut.

******************************************************

# STATE OF CONNECTICUT *v.* ANDRES C.*
## (SC 20692)

Robinson, C. J., and McDonald, D'Auria, Mullins,
Ecker, Dannehy and Bright, Js.**

*Syllabus*

Convicted of the crimes of sexual assault in the third degree and risk of injury to a child in connection with his alleged sexual abuse of the complainant, C, the defendant appealed to the Appellate Court, claiming, inter alia, that he was entitled to the disclosure of the content of certain handwritten journals authored by C because they purportedly constituted a "statement" under the relevant rules of practice (§§ 40-13A and 40-15 (1)) and that his rights under *Brady* v. *Maryland* (373 U.S. 83) were violated as a result of the procedures the prosecutors employed to review the journals for exculpatory information. C revealed the existence of the journals for the first time at trial, testifying that she created them in connection with the therapy she was receiving after the abuse and that they concerned her relationship with the defendant and the abuse he had inflicted, among other things. C admitted to defense counsel on recross-examination that she had reviewed a few pages in one of her journals before testifying and that the journals were "the best record" of the abuse. At that point, defense counsel requested the journals "as discovery . . . ." Following an in camera meeting with defense counsel and the prosecutors, the trial court summarized the discussions that had occurred in chambers and ordered the prosecutors to review the journals for C's statements about the sexual abuse allegations and for any exculpatory material, and to disclose such material to the defense. The court stated that, if the prosecutors were uncertain as to

---

* In accordance with our policy of protecting the privacy interests of the victims of sexual abuse and the crime of risk of injury to a child, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

** This case originally was scheduled to be argued before a panel of this court consisting of Chief Justice Robinson and Justices McDonald, D'Auria, Mullins and Ecker. Thereafter, Justice Dannehy and Chief Judge Bright were added to the panel and have read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision.

whether parts of the journals were exculpatory, the court would review those portions and make a determination. The prosecutors and defense counsel agreed with the court's summary. Thereafter, the prosecutors enlisted the assistance of a Spanish-speaking investigator employed by the state's attorney's office to help review the journals because they had been written in Spanish. The prosecutors explained to the trial court that the investigator had been instructed as to what is "exculpatory" and then represented to the court, on the basis of the investigator's review, that the journals contained no material subject to disclosure under *Brady*. The prosecutors nevertheless turned over four pages from the journals, out of an abundance of caution, for the trial court to review to determine whether any or all of those pages should be disclosed to the defense. Those four pages were translated, after which the trial court determined that one of those four pages should be disclosed, as the content of that page concerned C's allegedly delayed disclosure of the abuse, which was at issue. On appeal, the Appellate Court affirmed the judgment of conviction, concluding that the defendant had waived his claim that he was entitled to the journals under Practice Book §§ 40-13A and 40-15 (1) insofar as defense counsel had agreed to the trial court's summary of the procedure that had been discussed in chambers, and the court rejected the defendant's claim that the prosecutors were constitutionally required to personally review the journals and could not delegate that review to an investigator. The defendant, on the granting of certification, appealed to this court, challenging the Appellate Court's conclusions and urging this court to adopt a prophylactic rule under the United States constitution requiring a prosecutor to personally review any material that first comes to light during trial for, inter alia, exculpatory information. The state asserted, with respect to the defendant's claim under §§ 40-13A and 40-15 (1), that this court should affirm the Appellate Court's judgment on the alternative ground that C's journals were not subject to discovery because C purportedly did not adopt or approve the journals as her "statement" for purposes of those rules of practice. *Held*:

1. This court agreed with the state's alternative ground for affirmance, namely, that C's journals were not subject to disclosure under Practice Book §§ 40-13A and 40-15 (1) because they did not constitute a statement that was adopted or approved by C, and, therefore, this court did not address whether the Appellate Court correctly determined that the defendant had waived his claim concerning disclosure pursuant to those rules of practice:

   a. The state's alternative ground for affirmance was reviewable, even though the state did not raise its claim in the Appellate Court or seek permission to raise it in this court pursuant to the relevant rule of practice (§ 84-11 (b)):

It was appropriate to review the state's alternative claim for affirmance under the circumstances of this case because the state could raise the same claim on remand if this court were to grant the defendant's requested relief of remanding the case to the trial court for further proceedings to determine whether the journals constituted a statement and because reviewing the claim would promote judicial economy, as the claim presented a pure question of law, the record was adequate for review, and both parties had briefed the issue.

b. The journals did not constitute a disclosable "statement" under Practice Book §§ 40-13A and 40-15 (1) because C did not adopt or approve the journals as her statement:

Practice Book § 40-13A requires the disclosure of all "statements" concerning the charged offense that are within the possession of the prosecuting authority or its agents, Practice Book § 40-15 (1) defines "statement" as a written statement that the witness signs or otherwise adopts or approves, and, because there was no indication that C signed her journals, the issue with which this court was presented was whether C otherwise adopted or approved those journals.

For a statement to be adopted or approved, there must be some indication that the witness has vouched for or intends to be accountable for the content of the statement, and, unlike statements given to law enforcement officers or government agents, diaries or similar personal writings typically are not created with the intent of fully and accurately describing the author's recollection of the events in question and with the understanding that the author may be held accountable in court for the veracity of the statements contained therein.

In the present case, there was no indication in the record that C vouched for or intended to be held accountable for the content of her journals such that she adopted or approved of it, as she did not embrace the content of her journals as her statement of the abuse, there was no evidence that she expected the content of the journals to be communicated or transmitted to anyone else, and her acknowledgment that the journals were "the best record" of the abuse was merely an affirmative answer to a question posed by defense counsel.

Moreover, C did not maintain the journals with the primary purpose of accurately memorializing her recollection of the abuse but, instead, testified that the journals had been maintained as part of a therapeutic exercise undertaken at the direction of a mental health professional, and C also testified that some portions of the journals were not meant to be factual but, rather, consisted of hypotheticals and counterfactuals describing events that had never occurred.

Furthermore, although C suggested that some portions of the journals contained her recollection of the abuse and that those portions were

"the best record" thereof, that did not mean that she was knowingly adopting the journals as a formal statement or that she knew or reasonably should have known from the circumstances surrounding defense counsel's questioning of her that she could be held accountable in court for any omissions or inaccuracies in the journals or that they could be used for cross-examination and impeachment purposes.

Rather, C reasonably could have believed that her journals were "the best record" of what had happened, even if she would have been unwilling to stand by them in court because they omitted facts or contained inaccuracies or fabrications.

In addition, although C agreed to provide her journals to the prosecutors for review, she did so at the trial court's request, and nothing suggested that she did so with the intent to provide information about the sexual abuse or with the knowledge that she could be held accountable for the completeness and factual accuracy of the content of the journals.

2. The Appellate Court correctly concluded that the *Brady* review of C's journals by a nonlawyer member of the state's attorney's office was constitutionally adequate, and this court declined the defendant's request to adopt a prophylactic rule under the federal constitution requiring a prosecutor to personally review for exculpatory and impeachment information any material that first comes to light during trial:

The limited case law concerning whether a prosecutor may delegate his or her duty to review material for information that must be disclosed pursuant to *Brady* suggested that such delegation is not constitutionally prohibited and that a prosecutor does not have a constitutional obligation to personally review the material to determine whether disclosure is required.

The defendant's claim for a prophylactic rule, however, was premised on the fact that, because the existence of C's journals was not disclosed until trial, the prosecutors were uniquely qualified to determine whether the journals contained exculpatory or impeachment evidence and, therefore, had a duty to personally review the journals rather than enlisting the assistance of staff, and, although this court agreed with the defendant that familiarity with a witness' testimony is necessary to make a determination as to whether particular evidence is subject to disclosure under *Brady*, it concluded that a prophylactic rule was not necessary because it perceived no significant risk that, in the absence of such a rule, the constitution would be violated.

This court determined that the defendant's proposed rule was unnecessary and unwarranted because there already was a sufficient safeguard, specifically that, when potentially exculpatory information comes to light during trial, a defendant or counsel may request production of the information and make a preliminary showing that the specific informa-

tion in question contains material, favorable evidence, and, if the prosecutor reviews the information and claims that it contains no evidence subject to disclosure under *Brady*, the defense can request an in camera review of the information by the trial court.

Moreover, the defendant's proposed rule improperly assumes that only the prosecutor handling the trial will have the requisite familiarity with the proceedings, ignores the fact that experienced individuals other than the trial prosecutor may possess that familiarity, and could cause extraordinary delays in the trial depending on the volume of the information at issue, and there was no reason to believe that the proposed rule was necessary on the ground that the risk of a constitutional violation is sufficiently great that simple case-by-case enforcement is inadequate, the defendant having pointed to no evidence that prosecutors or courts are experiencing difficulty determining in particular cases whether an individual other than the trial prosecutor is qualified to conduct a review for *Brady* material.

Furthermore, although the defendant claims that this court cannot have confidence that the investigator who conducted the *Brady* review in the present case was properly instructed about *Brady*'s requirements, the defendant did not expressly raise a freestanding claim that this particular delegation of *Brady* review was improper because the investigator was not adequately trained to conduct a review for *Brady* material or was not sufficiently familiar with the facts of the case.

Nonetheless, this court emphasized a prosecutor's unique obligations in the judicial system, as well as the prosecutor's ultimate responsibility for complying with *Brady* and ensuring in the first instance that the principles of justice that underlie *Brady* are fully served, and indicated that it is the better practice for prosecutors to personally review the information at issue, or at least to seek assistance from other attorneys or qualified staff who have received comprehensive training in the requirements of *Brady* review and who are sufficiently knowledgeable about the case at hand to appreciate the import of the information under review.

(*One justice concurring separately; one justice concurring and dissenting; one justice dissenting*)

Argued January 11, 2023—officially released June 18, 2024*

*Procedural History*

Substitute information charging the defendant with the crimes of sexual assault in the third degree, sexual assault in the fourth degree, and risk of injury to a child, brought to the Superior Court in the judicial district of New Haven and tried to the court, *Alander, J.*; judgment

of guilty of sexual assault in the third degree and risk of injury to a child, from which the defendant appealed to the Appellate Court, *Moll*, *Alexander*, and *DiPentima*, *Js.*, which affirmed the trial court's judgment, and the defendant, on the granting of certification, appealed to this court. *Affirmed.*

*Richard Emanuel*, for the appellant (defendant).

*Timothy F. Costello*, supervisory assistant state's attorney, with whom, on the brief, were *John P. Doyle, Jr.*, state's attorney, and *Mary A. SanAngelo* and *Brian K. Sibley, Sr.*, senior assistant state's attorneys, for the appellee (state).

*Opinion*

MULLINS, J. The defendant, Andres C., was convicted, after a court trial, of sexual assault in the third degree and risk of injury to a child. During the complainant's testimony at trial, she revealed that, after the assaults, she had engaged in therapy, and, during that therapy, she had kept journals, in Spanish, in which she had written about, among other things, her relationship with the defendant and his sexual abuse of her. Following this revelation, defense counsel requested that the trial court review the journals for potential statements and exculpatory information that should be disclosed to the defendant. After a discussion with the court about this revelation, the parties agreed that the complainant would provide the journals to the prosecutor,[1] and, because the journals were written in Spanish, the prosecutor would enlist the assistance of a Spanish-speaking investigator on her staff to help review the journals. On the basis of the investigator's review, the prosecutor represented to the court that there was no material in the journals that was subject to disclosure under *Brady*

---

[1] The case was tried by two prosecutors, Mary A. SanAngelo and Brian K. Sibley, Sr. When we refer to "prosecutor" in the singular, we are referring to SanAngelo.

v. *Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Out of an abundance of caution, however, she submitted four pages of the journals to the court for its review, indicating that she thought the pages were subject to General Statutes § 54-86f, the rape shield statute. Those four pages were translated into English and reviewed by the trial court, and the court disclosed one page to the defendant as potential impeachment material.

The defendant appealed to the Appellate Court. He alleged that (1) he was entitled to disclosure of the complainant's journals as the discoverable statements of a witness; see *State* v. *Andres C.*, 208 Conn. App. 825, 851, 266 A.3d 888 (2021); and (2) the prosecutor violated her *Brady* obligation by not personally reviewing the journals for *Brady* material but instead delegating that duty to the investigator. Id., 855. The Appellate Court affirmed the judgment of conviction. Id., 861. The court concluded, first, that the defendant had waived his claim that he was entitled to disclosure of the contents of the complainant's journals; id., 851–52; and, second, that the prosecutor did not violate *Brady* by delegating the review of the journals to the investigator. Id., 855, 860–61.

We then granted the defendant's petition for certification to appeal to this court, limited to the following issues: (1) "Did the Appellate Court incorrectly conclude that the defendant had waived his claim that he was entitled to disclosure of the contents of the complainant's journals as the discoverable statements of a witness?" And (2) "[d]id the Appellate Court incorrectly conclude that the *Brady* review . . . of the complainant's journals by a nonlawyer member of the state's attorney's office was constitutionally adequate?" (Citation omitted.) *State* v. *Andres C.*, 342 Conn. 901, 270 A.3d 97 (2022). We resolve the first question on the alternative ground that the journals were not discoverable

statements. We also conclude that the Appellate Court correctly concluded that the prosecutors were not constitutionally obligated to personally review the complainant's journals for *Brady* material. Accordingly, we affirm the judgment of the Appellate Court.

The Appellate Court's opinion sets forth the following facts that the trial court reasonably could have found and procedural history. "When [the complainant] was ten years old, [she], along with her mother and siblings, moved into her grandmother's home. Shortly thereafter, the defendant, the [complainant's] uncle, moved in. At some point, during the time that the [complainant] and the defendant were living at the grandmother's house, the defendant . . . had the [complainant] apply lotion to his penis and masturbate him. . . . This type of abuse occurred more than ten times over the next two years while the [complainant] lived at her grandmother's house and continued after she had moved to another house.

"The [complainant] described other instances of inappropriate behavior by the defendant. On one occasion, the defendant, while dressed only in boxer shorts, went into the [complainant's] bedroom, got under the covers with her, and rubbed the [complainant's] stomach and legs under her shirt and pajama bottoms. After the [complainant] had moved to another house, she would, on occasion, sleep over at her grandmother's home. During several of these occasions, the defendant got into bed with the [complainant] and rubbed himself against her so that she felt his penis against her back.

"A few years later, the then sixteen year old [complainant] began speaking with a therapist [Milagros Vizueta], and she disclosed the sexual abuse during her first session. At a therapy session attended by her mother and brother, the [complainant] disclosed the sexual abuse by the defendant. Thereafter, on October

28, 2015, the [complainant] reported the defendant's conduct to the police. The defendant was [subsequently] arrested . . . ." *State* v. *Andres C.*, supra, 208 Conn. App. 828–29.

On the first day of trial, the complainant testified that, during her therapy sessions with Vizueta, "Vizueta occasionally took notes and would write down things for the [complainant] to 'work on . . . .' During redirect examination, the prosecutor inquired whether the [complainant] ever had seen her records from the therapy [sessions] with Vizueta. The [complainant] responded: 'I have my journals. . . . I don't have—I don't know her records, but I have my journals.'[2] Upon further inquiry, the [complainant] stated: 'For the journals, [Vizueta] would have me write a lot about either my relationship to [the defendant], with [the defendant], how the abuse happened. I would reflect a lot on how it made me feel, how I was missing, why I didn't want to talk. Sometimes in the journal we'd write about— like if I was having family fights, so my journals are the abuse that I lived with him, but also family fights with my siblings and my mom.' The [complainant] also stated that the journals were her 'words through therapy.'

"On recross-examination, defense counsel inquired ['prior to coming here, did you read your journals?'] . . . The [complainant] responded that she had looked at a 'few pages' in one of her journals. The following colloquy between the [complainant] and defense counsel then occurred:

" 'Q. Okay. Were those—and the—the journals that you have, are those your notes that [you] wrote at the time things were happening?

---

[2] The Appellate Court noted that, "[o]n the basis of [its] review of the transcripts, it appear[ed] that neither the prosecutors nor defense counsel had been aware of these journals until the [complainant] mentioned them during her testimony." *State* v. *Andres C.*, supra, 208 Conn. App. 845 n.11. We agree.

" 'A. No, it was while I was in therapy.

" 'Q. Okay. But it was part of the therapy process about what you spoke to the doctor about, what she told you and what happened to you, right?

" 'A. Yes.

" 'Q. And it would be much closer in time to the events that we're talking about; [is that] fair to say?

" 'A. When I was journaling, closer to the abuse, yes.'

" 'Q. Would—would those be the best record you have of what happened? . . .

" 'A. Yes.

" 'Q. Okay. And you still have those journals?

" 'A. Yes.'

"At this point, defense counsel requested an in camera review of the [complainant's] journals. The prosecutor objected, arguing that the journals did not constitute medical records but rather were akin to a diary. The [trial] court inquired whether the journals were privileged documents, by statute or common law. The prosecutor then requested time to research the issue. Defense counsel suggested that the court should review the journals for exculpatory material. The court responded that the obligation to review the journals for exculpatory material rested with the prosecutors and that, if there was a claim of privilege, it would conduct an in camera review. Defense counsel responded: 'I am asking for it as discovery; however, I was trying to be as respectful as I could be to the complainant.' The court then suggested a further discussion of this issue in chambers and mentioned the possibility of recalling the [complainant] as a witness, if necessary.

"The next day . . . the [trial] court summarized the discussions that had occurred in chambers: 'I have

determined that [the complainant's] journals should be reviewed by the state to determine, what, if anything in those journals [comprised of 3 notebooks totaling approximately 200 pages] . . . comprise statements by [the complainant] concerning the incidents in question here, and any exculpatory material. . . . [U]pon that review [the state] should disclose to defense counsel any such material, specifically, statements made by [the complainant] in her journals concerning the sexual assault allegations here or any exculpatory material, and if there is anything the state is uncertain as to whether it is exculpatory, [the prosecutors] can provide those portions of the journals to me, and I will review them in camera to determine whether they should be disclosed to defense counsel.

" 'It is my understanding that the state has talked to [the complainant]. She has agreed to provide the journals to [the state], they will be provided to the state sometime this afternoon . . . but apparently the journals are in Spanish so the state needs the assistance of someone on [its] staff to interpret those journals so that [it] can fulfill [its] obligation[s] as I've outlined them.' The prosecutors and defense counsel agreed with the court's summary, and neither side raised any objection.

"The next day, the [trial] court placed the following on the record: 'It is my order that the state review those journals to determine if there is any exculpatory information with respect to those journals that need[s] to be disclosed to the defendant, and that includes any inconsistent statements and any statements regarding the therapy method used that may have fostered or . . . instructed [the complainant] to use her imagination or [to] speculate or embellish as to what happened, but, basically, the . . . state needs to review those journals

under its *Brady* obligations and . . . turn over to the defendant anything that is exculpatory.'[3]

"The [trial] court then confirmed that defense counsel had argued that at least some portions of the journals were subject to disclosure because the [complainant] had reviewed them prior to her testimony. The prosecutor countered that, aside from any *Brady* material, defense counsel was not entitled to review the [complainant's] private journals. The prosecutor further represented that her investigator had started the process of reviewing the 200 pages, which were handwritten in Spanish, and, after several hours of review, had not discovered any exculpatory material. The prosecutor also assured the court that she had given the investigator 'very, very clear instructions on what is exculpatory and what is not. [The prosecutor] sat in an office directly next to [the investigator], so, if [the investigator] had any questions at all, she came to [the prosecutor], and there is nothing exculpatory or inconsistent so far at all . . . .'

"The [trial] court then considered the defendant's claim that he was entitled to the journals because the [complainant] had used them to refresh her memory prior to her testimony. After [reviewing] § 6-9 of the Connecticut Code of Evidence, the court stated: 'In light of the fact that [the complainant] testified that she . . . used [only] a few pages of [the] journals that consisted of hundred[s]—at least, apparently, a couple hundred pages, and the fact that the state would be reviewing

---

[3] This order appears to be more limited in scope than the trial court's prior order. The prior order called for the state to review the journals for statements by the complainant concerning the incidents in question here, and any exculpatory material. This subsequent order relates only to the state's obligation to review the journals for exculpatory information. Whether this subsequent order is merely a refinement of the prior order or a superseding order is not entirely clear. Adding to the lack of clarity is that these orders resulted from discussions in chambers, and we have no record of what those discussions entailed.

all the journals with the obligation to turn over any exculpatory evidence to the defendant, I am not going to order that the entire journals be turned over to the defense for examination, also, in light of the private nature of those journals.' The court indicated it would make the journals a court exhibit, and the parties noted their agreement that a translation was not necessary at that point."[4] (Footnote added; footnote altered.) Id., 844–48.

"On the next day of trial . . . the prosecutor indicated that the investigator had completed the review of the [complainant's] journals.[5] Pursuant to General Statutes § 54-86c (b),[6] the prosecutors submitted, in a sealed envelope, four pages from the journals for review by [the trial] court . . . . In their view, the contents

---

[4] Specifically, the trial court stated that the parties had "agreed in chambers that [the journals do not] need to be translated . . . ." In response, defense counsel stated, "[c]orrect."

[5] "The prosecutor represented the following to the court: 'These records . . . were reviewed by my office, specifically . . . [by] . . . an investigator for the state's attorney's office. She has been with the state's attorney's office for fifteen years, she has been an investigator in our office for five years, she is bilingual, [and] she is a 2013 graduate of Albertus Magnus College with a major in [c]riminal [j]ustice. She was instructed by [the prosecutors] as far as what she was looking for, [and] we explained to her very carefully what the state's obligation is for exculpatory and *Brady* material.

" 'She indicated that she spent about ten hours reviewing these materials because they are in Spanish, and she took her time. These materials never left the state's attorney's possession; they did not go to her home, [and] they were [reviewed] during business hours. She indicated that she spent about ten hours reviewing them, and, whenever she had any questions, she would talk to [the prosecutors] . . . .' " *State* v. *Andres C.*, supra, 208 Conn. App. 848–49 n.12.

[6] General Statutes § 54-86c (b) provides: "Any state's attorney, assistant state's attorney or deputy assistant state's attorney may request an ex parte in camera hearing before a judge, who shall not be the same judge who presides at the hearing of the criminal case if the case is tried to the court, to determine whether any material or information is exculpatory."

"In the present case, the parties agreed that [the trial court] could review the four pages from the [complainant's] journals to determine whether there was any exculpatory material contained therein." *State* v. *Andres C.*, supra, 208 Conn. App. 849 n.13.

of these four pages were protected by . . . § 54-86f,[7] but, '[out of an] abundance [of] caution,' [the prosecutors] sought a judicial determination as to whether these items should be disclosed to the defense.

"Later that day, the [trial] court indicated that it had reviewed the four pages from the journals submitted by the prosecution and determined that one page should be disclosed to the defense. Specifically, the court stated: 'One of the material issues in this case is . . . [the complainant's] claim that she delayed disclosure of the alleged assaults by the defendant because, when [the complainant's cousin, D] reported such assaults,[8] the family rallied behind the defendant, and she felt that there was no one she could report [those] assault[s] to and be supported. . . . There is an incident [recorded in one of the journals in which] she disclosed a claim of sexual abuse to her mother, which could be interpreted as the mother then supporting her claim. So, I think it is material and exculpatory, so I will order it disclosed to the defendant.'

"[Thereafter], the [trial] court granted the defendant's motion to recall the [complainant] as a witness. During redirect examination by the prosecutor, the [complainant] explained that, following a prompt from Vizueta, she wrote a passage in her journal about what 'an envi-

---

[7] General Statutes § 54-86f provides in relevant part: "(a) In any prosecution for sexual assault under sections 53a-70, 53a-70a and 53a-71 to 53a-73a, inclusive, no evidence of the sexual conduct of the victim may be admissible unless such evidence is (1) offered by the defendant on the issue of whether the defendant was, with respect to the victim, the source of semen, disease, pregnancy or injury, or (2) offered by the defendant on the issue of credibility of the victim, provided the victim has testified on direct examination as to his or her sexual conduct, or (3) any evidence of sexual conduct with the defendant offered by the defendant on the issue of consent by the victim, when consent is raised as a defense by the defendant, or (4) otherwise so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights. . . ."

[8] The state presented evidence at trial that the defendant had also sexually abused D. *State* v. *Andres C.*, supra, 208 Conn. App. 829.

ronment in which speaking about abuse should have looked like, instead of what [she] grew up in.' Thus, the statements in her journal in which the [complainant] wrote that she had disclosed a sexual assault by a different family member to her mother [were] hypothetical in nature and part of a therapy exercise, and not based on actual events." (Footnote added; footnotes altered; footnote in original.) Id., 848–50.

Subsequently, the trial court found the defendant guilty of sexual assault in the third degree and risk of injury to a child and not guilty of sexual assault in the fourth degree, and rendered judgment accordingly. Id., 829. The trial court sentenced the defendant to a total of twenty years of incarceration, execution suspended after twelve years, and fifteen years of probation. Id. The defendant appealed to the Appellate Court, claiming, inter alia, that "he was entitled to the contents of the [complainant's] journals because they constituted a statement pursuant to Practice Book §§ 40-13A and 40-15 (1)"; id., 851; and that "his rights under *Brady* . . . were violated as a result of the procedures employed by the prosecutors with respect to the review of the [complainant's] journals for exculpatory information." (Citation omitted.) Id., 855. The Appellate Court concluded that the defendant (1) had waived his first claim insofar as defense counsel had agreed to the trial court's summary of the procedure that the parties had discussed in the trial court's chambers; see id., 854–55; and (2) had failed to demonstrate that the prosecutors could not constitutionally delegate the review of the journals to an investigator but were required to personally review the journals. See id., 855, 860–61. Accordingly, the Appellate Court affirmed the judgment of conviction. Id., 861.

This certified appeal followed. The defendant argues on appeal that the Appellate Court incorrectly resolved both claims. The state disagrees but also argues, with

respect to the defendant's claim pursuant to Practice Book §§ 40-13A and 40-15 (1), that we should affirm the judgment of the Appellate Court on the alternative ground that the complainant's journals are not discoverable because they do not constitute a "statement" for purposes of those rules. The defendant counters that the state's alternative ground for affirmance is not reviewable because the state did not raise it in the Appellate Court and did not seek permission to raise it in this certified appeal. See Practice Book § 84-11 (b).[9]

We conclude that, under the specific circumstances of the present case, we may review the state's unpreserved alternative ground for affirmance. In doing so, we conclude that the complainant's journals were not subject to discovery under Practice Book §§ 40-13A and 40-15 (1) because the complainant did not adopt or approve them as her statement. Consequently, we need not decide whether the Appellate Court correctly determined that the defendant waived this claim.[10] With

[9] Practice Book § 84-11 (b) provides: "Within ten days of the filing of the appeal, the appellee may file a statement of alternative grounds for affirmance or adverse rulings or decisions to be considered in the event of a new trial, provided that such party has raised such claims in the Appellate Court. If such alternative grounds for affirmance or adverse rulings or decisions to be considered in the event of a new trial were not raised in the Appellate Court, the party seeking to raise them in the Supreme Court must move for special permission to do so prior to the filing of that party's brief. Such permission will be granted only in exceptional cases where the interests of justice so require."

Although Practice Book § 84-11 was amended in 2022, those amendments, which took effect on January 1, 2023, have no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current version of that rule.

[10] Justice Ecker would conclude that the defendant's claim was not waived, a question that is far more complex than the question of whether the journals constituted a statement. See footnote 5 of the dissenting opinion. Without belaboring the point, we note, for example, that it is unclear from the record whether the trial court's order concerning the scope of the state's *Brady* review was intended to supersede its previous order that the state review the journals for statements or, instead, was intended only to refine its previous order that the state review the journals for exculpatory material. See footnote 3 of this opinion. The state seems to adopt the former interpretation, whereas the defendant appears to adopt the latter. There is nothing in the record, however, to establish that the trial court sought only to refine its prior order as opposed to issuing a new order

respect to the defendant's second claim, we conclude, on the basis of the record in the present case, that the state did not violate its obligations under *Brady* and that there is no justification for the constitutional prophylactic rule proposed by the defendant.

I

The defendant first contends that the Appellate Court incorrectly determined that he waived his claim that he was entitled to disclosure of the complainant's journals under Practice Book §§ 40-13A and 40-15 (1) insofar as defense counsel had agreed to the procedure outlined by the trial court after the discussion in the trial court's chambers. As mentioned, we need not address this claim because, regardless of whether the defendant waived the claim, he cannot prevail. Specifically, we agree with the state that the journals were not subject to disclosure under §§ 40-13A and 40-15 (1) because they were not adopted or approved by the complainant.

A

As a preliminary matter, we address the defendant's contention that the state's claim that the complainant's journals do not constitute a disclosable statement is unreviewable because the state did not raise that claim in the Appellate Court and did not seek permission to raise it in this certified appeal, as required by Practice Book § 84-11 (b). We conclude that, under the specific circumstances of the present case, we can and should review the state's claim for two interrelated reasons.

First, the relief that the defendant seeks if we were to agree with his claim is a remand to the Appellate Court with direction to remand the case to the trial court

___

directed solely at *Brady.* The fact that the subsequent order followed an in-chambers discussion between the parties and the trial court, where the defense acquiesced in the procedure the court laid out regarding how the state would review the records, only further complicates the picture.

for it to conduct proceedings to determine whether the journals constitute a statement. If we were to grant that relief, nothing would prevent the state from raising on remand the same claim that it has raised on appeal.

Second, the issue of whether a witness' personal journals constitute a disclosable statement within the meaning of the rules of practice presents a pure question of law on this record, the record is adequate for review of the state's claim, and both parties have briefed the issue.[11] We conclude, therefore, that considerations of judicial economy militate in favor of reviewing the state's alternative ground for affirmance. Cf. *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 171–72, 84 A.3d 840 (2014) ("interests of judicial economy justify appellate review of an unpreserved, alternative ground for affirmance that likely would arise when . . . a decision in favor of the appellant would result in a remand for a new trial").

B

We turn, therefore, to the merits of the state's claim that the complainant's journals do not constitute a disclosable statement under Practice Book §§ 40-13A and 40-15 (1). The state contends that (1) a document or communication qualifies as a statement only if the wit-

---

[11] We acknowledge that whether a statement has been adopted or approved for purposes of the rules of practice may be a mixed question of fact and law, with the historical facts subject to review for clear error and the legal question of whether the established subsidiary facts constitute adoption or approval subject to plenary review. See, e.g., *Lapointe* v. *Commissioner of Correction*, 316 Conn. 225, 264, 112 A.3d 1 (2015). There is no factual issue in the present case because the relevant subsidiary facts—namely, the complainant's statements about the journals during her testimony—are undisputed. See footnote 14 of this opinion. Whether these undisputed statements constituted an adoption or approval of the journals is a question of law. See, e.g., *Bridgeport* v. *Plan & Zoning Commission*, 277 Conn. 268, 275, 890 A.2d 540 (2006) (whether party complied with statutory notice requirements under General Statutes § 8-3 (a) was mixed question of fact and law subject to plenary review when facts were undisputed and dispute concerned "the trial court's application of § 8-3 (a) to those facts").

ness conveyed it to a government agent, which was not true of the complainant's private therapy journals, and (2) the complainant did not adopt or approve of the journals. Because we conclude that the complainant did not adopt or approve her journals, we need not determine whether the statement must be made to a government agent.[12]

We begin with the standard of review. "The interpretive construction of the rules of practice is to be governed by the same principles as those regulating statutory interpretation. . . . The interpretation and application of a statute, and thus a Practice Book provision, involves a question of law over which our review is plenary." (Internal quotation marks omitted.) *Meadowbrook Center, Inc.* v. *Buchman*, 328 Conn. 586, 594, 181 A.3d 550 (2018).

With these principles in mind, we review the language of the rules of practice. Practice Book § 40-13A provides: "Upon written request by a defendant and without requiring any order of the judicial authority, the prosecuting authority shall, no later than forty-five days from receiving the request, provide photocopies of all statements, law enforcement reports and affidavits within the possession of the prosecuting authority and his or her agents, including state and local law enforcement officers, which statements, reports and affidavits were prepared concerning the offense charged, subject to the provisions of Sections 40-10 and 40-40 et seq." Practice Book § 40-15 provides in relevant part: "The term 'statement' as used in Sections 40-11, 40-13 and 40-26 means . . . (1) [a] written statement made by a person *and signed or otherwise adopted or approved by such person* . . . ." (Emphasis added.) We interpret

---

[12] We also need not consider whether, for purposes of Practice Book §§ 40-13A and 40-15 (1), an author's written work product constitutes a statement when the author never shared the writing with anyone else.

the definition of "statement" in § 40-15 (1) also to extend to that term as used in § 40-13A.[13]

Pursuant to Practice Book § 40-15 (1), the complainant's journals constitute a "statement" only if she "signed or otherwise adopted or approved" the journals. There is no indication that the complainant signed her journals. The issue before us, then, is whether she otherwise adopted or approved the journals.

Because the definition of "statement" in Practice Book § 40-15 (1) was borrowed from the federal Jencks Act, 18 U.S.C. § 3500, which sets the requirements for disclosing government witness statements in federal prosecutions, this court consistently has relied on the history and judicial interpretations of the Jencks Act when construing § 40-15 and related rules of practice. See, e.g., *State* v. *Johnson*, 288 Conn. 236, 278–79, 951 A.2d 1257 (2008) (looking to federal decisions interpreting Jencks Act to resolve whether Practice Book §§ 40-13 and 40-15 impose affirmative duty on government to create record of witness interviews); *State* v. *Cain*, 223 Conn. 731, 749, 752–53, 613 A.2d 804 (1992) (relying on case law interpreting Jencks Act in construing predecessor to § 40-15 (2)).

Courts have held that, in order to conclude that a statement is adopted or approved under the Jencks Act

---

[13] We acknowledge that Practice Book § 40-15 does not expressly provide that the definition of "statement" in that section applies to the word "statement" as used in Practice Book § 40-13A but refers to the term only as used in Practice Book §§ 40-11, 40-13 and 40-26. Before the adoption of § 40-13A in 2009; see Practice Book (2010) § 40-13A; Practice Book (2009) § 40-13 (a) (1) required the state to produce "[a]ny statements of the witnesses in the possession of the prosecuting authority or his or her agents, including state and local law enforcement officers, which statements relate to the subject matter about which each witness will testify . . . ." That provision was deleted when § 40-13A was adopted. See Practice Book (2010) § 40-13 (a). It would appear that the failure to amend § 40-15 to include a reference to the new section, § 40-13A, was an oversight. In the present case, both parties have assumed that § 40-15 (1) applies to § 40-13A.

or rule 26.2 of the Federal Rules of Criminal Procedure, which effectively incorporates the Jencks Act into the federal criminal procedure rules; see, e.g., *United States* v. *Scotti*, 47 F.3d 1237, 1249 (2d Cir. 1995); there must be some indication that the witness has vouched for, or intends to be accountable for, the contents of the writing. See, e.g., *United States* v. *Gotchis*, 803 F.2d 74, 77–78 (2d Cir. 1986). "Not everything a witness has written constitutes his 'statement' within [18 U.S.C.] § 3500 (e) (1)." *United States* v. *Thomas*, 97 F.3d 1499, 1502 (D.C. Cir. 1996). This interpretation is consistent with the public policy principles underlying the Jencks Act. As Justice Lewis F. Powell, Jr., explained in his concurring opinion in *Goldberg* v. *United States*, 425 U.S. 94, 96 S. Ct. 1338, 47 L. Ed. 2d 603 (1976), "[i]n the ordinary course the [g]overnment in taking statements of . . . witnesses will impress [on] them the probable use of the statements. Congress recognized as much, noting that one reason the [g]overnment takes statements is to tie the witness down so that he will stand by the statement." (Internal quotation marks omitted.) Id., 126 n.16 (Powell, J., concurring in the judgment). He further noted that the "guarantees of dependability that Congress relied [on] . . . arise partly from the sense that a witness normally would have of going on the record when he makes a statement . . . ." (Footnotes omitted; internal quotation marks omitted.) Id., 126 (Powell, J., concurring in the judgment).

Justice Powell also emphasized the unfairness of holding a witness accountable for a statement that was not made with "the knowledge that he is formalizing a statement [on] which he may be cross-examined." Id., 125 (Powell, J., concurring in the judgment). He observed that, if a statement is "producible on a showing of less than knowing adoption as a formal statement, honest and reliable witnesses will be postured wrongly before the [fact finder] as having made inconsistent

statements. This is unfair to the witness, and it unduly handicaps the [g]overnment's efforts to [successfully prosecute] guilty defendants." Id., 128 (Powell, J., concurring in the judgment). Accordingly, "to protect interests sought to be served by the [Jencks] Act," the witness must make and approve the statement "with the knowledge that he is formalizing a statement [on] which he may be cross-examined." Id., 125 (Powell, J., concurring in the judgment); see, e.g., *United States* v. *Gotchis*, supra, 803 F.2d 78 (witness must evince "an intent to be held accountable for the content of his [statement]").

"The question of adoption [of a witness' statement] arises [most] frequently in connection with notes taken by a [g]overnment agent while interviewing a witness." *United States* v. *Bosier*, 12 M.J. 1010, 1013 (A.C.M.R. 1982); see, e.g., *United States* v. *Valdez-Gutierrez*, 249 F.R.D. 368, 372 (D.N.M. 2007). In such cases, the government agent typically memorializes a summary of the interview and then asks the witness to review the summary for accuracy and completeness and, by signing, to adopt it as his or her own statement. Unlike statements given to a law enforcement officer or other government agent, diaries or similar personal writings, including the "diaries" of an agent or government informant, typically are not created with the intent of fully and accurately describing the author's recollections of the events in question or with the understanding that the author may be held accountable in court for their veracity. On this point, the case of *United States* v. *Melo*, 411 F. Supp. 2d 17 (D. Mass. 2006), is instructive.

In *Melo*, the United States magistrate judge addressed whether a government agent's own rough, handwritten notes, taken while conducting surveillance of the defendant during the investigation, were subject to production under the Jencks Act and rule 26.2 of the Federal Rules of Criminal Procedure. See id., 18. Although the

agent testified that the information in the surveillance log was accurate and that he did not put anything in the log that he did not believe to be true, the magistrate nevertheless concluded that the notes were not adopted or approved. See id., 24. In reaching this conclusion, the magistrate observed that, for purposes of the Jencks Act, " '[s]igning' . . . means putting a signature or other mark on the [document] so as to attest to [its] accuracy and to intend to be accountable in a formal manner for [its] contents." Id., 20. The magistrate then concluded that " 'approv[ing]' or 'adopt[ing]' . . . connote[s] the same thing as 'signing.' " Id. In addition, the magistrate observed that there was no indication that the agent intended the notes to be final. See id., 24. Rather, the notes likely contained impressions and interpretations, were not in the nature of a complete recitation that eliminated the possibility of portions being selected out of context, and ultimately were not meant to be a complete account of what was observed during the surveillance. See id., 21–22, 24; see, e.g., *United States* v. *Carrasco*, 537 F.2d 372, 375 (9th Cir. 1976) ("[a] statement, unlike notes or a diary, seeks to transmit information from the declarant to the reader"); *State* v. *Morrison*, 33 Or. App. 9, 16, 575 P.2d 988 (1978) ("[t]o be a statement that can be used for impeachment, there must have been some intent to communicate information to another").

In the present case, we conclude that the complainant did not formally adopt or approve her journals as required by Practice Book § 40-15 (1). There is no indication in the record that the complainant "vouched for" the journals or intended to be held accountable for their contents. *United States* v. *Gotchis*, supra, 803 F.2d 77–78. She acknowledged authorship. And she agreed with defense counsel's suggestion that the journals were the "the best record [she had] of what [had] happened . . . ." But she did not embrace them as her statement

of the abuse or in any way indicate that she intended to be held accountable for the contents of the journals. In fact, there is no evidence whatsoever that she even expected that the contents of her private diaries would be communicated or transmitted to anyone else. Confirming the complainant's intent to formally adopt the journals was especially important in a case such as this, in which English is not the complainant's native language and her previously mentioned acknowledgments came only in providing affirmative answers to questions posed by defense counsel.

It is also highly significant that the complainant did not maintain the journals with the primary purpose of accurately memorializing her recollections of the events in question. Instead, she described them as therapeutic journals, her "words through therapy," that she maintained at the direction of a mental health professional to help her process her feelings about the abuse. Indeed, the complainant testified that some portions of the journals, at least, were not factual at all. Rather, they were therapy exercises in which she was encouraged to imagine hypothetical assaults and counterfactual family environments. This is illustrated by the portion of the journals that was admitted into evidence. In that part of her journals, the complainant described herself disclosing the abuse to her mother and depicted her mother as believing her. The complainant testified, however, that these events never happened and that her therapist had instructed her to describe, as a therapeutic exercise, what should have happened if she had disclosed the abuse to her family. The complainant was clear that that account was not intended to be a factual one and that she had not disclosed the abuse to her mother until after it had ceased, while the complainant was in therapy.

Although the complainant's testimony suggests that some portions of the journals contain her recollections

of the past abuse, and she indicated that those portions are the "best record" she had of that abuse, that does not mean that she was knowingly adopting the journals as a formal statement. Nor does it imply that she knew or reasonably should have known from the circumstances surrounding defense counsel's questioning of her that she could be held accountable in court for any omissions or inaccuracies in the journals, or that they could be used for cross-examination and impeachment purposes.[14]

---

[14] The defendant seems to suggest that the policy underlying the requirement that the statement be signed, adopted or approved is to ensure that the statement is *authentic*, i.e., that it is what it purports to be. Specifically, he states that the complainant adopted and approved the journals when she "acknowledged under oath that the journals were her own handwritten product, and she described their contents." As we explained, that is not the purpose of the requirement, or at least not the *exclusive* purpose. Signing, approving or adopting is also required to ensure that the witness knows that he or she may be held accountable for the truth and accuracy of the statement in a court of law. The question before us is whether the complainant *did in fact* knowingly adopt or approve the journals as a formal account of the alleged abuse. See *Goldberg* v. *United States*, supra, 425 U.S. 128 (Powell, J., concurring in the judgment) (Jencks Act requires showing of "knowing adoption as a formal statement"). No reasonable fact finder could conclude, on the basis of the record, that the complainant ever had any intent to adopt or approve the journals as her formal statement of the abuse or that she had any knowledge of the consequences of doing so. Simply acknowledging that she had written the journals, even if under oath, is not the equivalent of adopting or approving their contents as a formal statement.

Contrary to Justice Ecker's contention, our conclusion that the existing records do not establish that the complainant adopted or approved the journals as a statement does not mean that we believe that the state was required to formally canvass the complainant to ensure that she knew that she could be held accountable in court for any omissions or inaccuracies in the journals or that they could be used for cross-examination and impeachment purposes. See footnote 9 of the dissenting opinion. It means only that we believe that the evidence must support the conclusion that the complainant knowingly provided the journals to the state as her formal account of the abuse, i.e., that she provided them under circumstances that would reasonably lead her to believe that she would be held accountable for inconsistencies between the journals and her testimony at trial. The fact that the complainant's testimony would support an inference that some portions of the journals in fact contained an accurate account of the abuse is not sufficient.

Finally, contrary to Justice Ecker's suggestion, there is no reason to believe that, even if the journals do not constitute a statement for purposes of Practice

Indeed, the complainant reasonably could have believed that her journals were her "best record" of what had happened, even if she would have been unwilling to stand by them in court because they omitted facts or contained inaccuracies or fabrications. As far as the record shows, the journals were her *only* written account of what had happened, and at least part of the account was written for therapeutic reasons, not as a historical record. And nothing in the rules of practice suggests that a defendant is entitled under Practice Book §§ 40-13A and 40-15 (1) to a witness' best record of what happened if the witness did not formally approve or adopt the record as an accurate account of her recollection for which she could be held accountable in court, even assuming that the record was actually accurate and complete. Of course, if the complainant's journals contained impeachment or exculpatory material, that material would be subject to disclosure under *Brady*, regardless of whether the complainant had adopted or approved them as a statement for purposes of the rules of practice.

Finally, in the present case, although the complainant later agreed to provide the journals to the state, nothing in the record suggests that, even then, she did so with the intent to provide information about the offense or with the knowledge that she could be held accountable for the completeness and factual accuracy of their contents under cross-examination in court. Rather, as far as the record shows, the sole reason that she provided

Book §§ 40-13A and 40-15 (1), the undisclosed portions of the journals necessarily contain information that is subject to *Brady*. See part I of the dissenting opinion. Any descriptions of the defendant's sexual abuse contained in the journals could be purely inculpatory and consistent with the complainant's trial testimony, and there is no reason to believe that the journals contained "[f]abricated claims of abuse," other than the counterfactual account that was disclosed. Id. Indeed, Justice Ecker himself recognizes that "[i]t is not clear what information the journals contain . . . ." Footnote 26 of the dissenting opinion.

the journals to the state was that the trial court asked her to turn them over.

We therefore conclude that the defendant was not entitled to disclosure of the complainant's journals under Practice Book §§ 40-13A and 40-15 (1) because the complainant did not adopt or approve them as her statement.[15]

## II

We turn next to the defendant's claim that the Appellate Court incorrectly determined that the *Brady* review of the complainant's journals by a nonlawyer member of the state's attorney's office was constitutionally adequate.[16] Specifically, he contends that, because the exis-

---

[15] We note that the defendant was not without recourse in this respect. As the state points out, although "[a] criminal defendant has no general constitutional right to discovery"; *State* v. *Fuller*, 178 Conn. App. 575, 582, 177 A.3d 578 (2017), cert. denied, 327 Conn. 1001, 176 A.3d 1194 (2018); the defense could have issued a subpoena duces tecum to the complainant to compel production of any exculpatory or impeachment materials contained in the journals upon making a showing that they could allow the defense to challenge the complainant's credibility. See, e.g., *State* v. *DeCaro*, 252 Conn. 229, 251, 745 A.2d 800 (2000) (defense issued subpoena duces tecum to key state witness); id., 256 n.22 (noting that, "[o]f course, the state does not dispute that [a] subpoena is an appropriate process for the production of documents that are relevant to the matter before the [trial] court" (internal quotation marks omitted)); *State* v. *Wiener*, 58 Conn. App. 203, 207–208, 210–11, 753 A.2d 376 (2000) (defendant has right under due process and confrontation clauses to subpoena records of state witness that would allow defendant to challenge witness' credibility), appeal dismissed, 256 Conn. 223, 772 A.2d 592 (2001). We further note that we are aware of no requirement that a defendant must establish that a witness has signed, adopted or approved a written account of facts related to the witness' testimony that is exculpatory or impeaching or that the witness has provided the account to the state before the defense can issue a subpoena duces tecum seeking to compel *the witness* to produce the writing. We, of course, express no opinion here as to whether the journals in fact contained any information to which the defendant would have been constitutionally entitled if they had been subpoenaed.

[16] The state contends that, because the complainant's journals were not, and never had been, in the possession of the state when defense counsel learned of their existence during trial and made his initial request for discovery, they could not contain evidence subject to disclosure under *Brady* at that time. See, e.g., *United States* v. *Marshall*, 132 F.3d 63, 68 (D.C. Cir. 1998) ("the government cannot be required to disclose evidence that it neither possesses nor controls"); *Conyers* v. *Wainwright*, 309 F. Supp. 1101, 1105 (S.D. Fla. 1970) (prosecutor had

tence of the complainant's journals was not disclosed until she testified at trial, the prosecutors were uniquely qualified to determine whether the journals contained impeachment evidence, and, therefore, they had a constitutional obligation to review the journals personally rather than enlisting the assistance of a member of their staff who had not been present during the complainant's testimony to review them. Thus, the defendant argues that this court should adopt a constitutional prophylactic rule requiring a prosecutor personally to review material for exculpatory and impeachment information if the material comes to light during trial.[17] We disagree.

We begin our analysis with a brief discussion of the nature of constitutional prophylactic rules and the dis-

no duty to discover potentially exculpatory evidence or to make evidence available to defendant, but, once defendant became aware of existence of evidence, defendant had right to compulsory process). But see *United States* v. *Brooks*, 966 F.2d 1500, 1504 (D.C. Cir. 1992) ("[when] there is an explicit request for an apparently very easy examination, and a [nontrivial] prospect that the examination might yield material exculpatory information," prosecution should seek out potentially exculpatory information that is not within its possession). The state also suggests that the proper procedure would have been for the defense to issue a subpoena duces tecum to the complainant to compel production of the journals. See footnote 15 of this opinion; see also *United States* v. *Yousef*, 327 F.3d 56, 112–13 (2d Cir.) (defendant could not complain about unavailability of potentially exculpatory evidence when he failed to use procedural tools at his disposal to obtain evidence), cert. denied, 540 U.S. 933, 124 S. Ct. 353, 157 L. Ed. 2d 241 (2003), and cert. denied sub nom. *Ismoil* v. *United States*, 540 U.S. 993, 124 S. Ct. 492, 157 L. Ed. 2d 392 (2003). Both parties, however, appear to have assumed in the proceedings before the trial court that, once defense counsel requested production of the journals and the complainant provided them to the state, any exculpatory or impeachment evidence that they contained was subject to disclosure under *Brady*. Because the state did not raise any claim to the contrary before the trial court, we also assume, for present purposes, that that is the case.

[17] The state claims that, because it disclosed the method that it intended to use to review the journals, and defense counsel failed to object to that method, the defendant waived any claim that the method was unconstitutional. We agree with the Appellate Court that the defendant's claim is reviewable pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). See *State* v. *Andres C.*, supra, 208 Conn. App. 855–56; see also, e.g., *State* v. *Rosa*, 196 Conn. App. 480, 496–97, 230 A.3d 677 (reviewing defendant's unpreserved *Brady* claim pursuant to *Golding*), cert. denied, 335 Conn. 920, 231 A.3d 1169 (2020).

tinction between such rules and ordinary case-by-case judicial review of constitutional claims. This court has recognized that "courts have the duty not only to craft remedies for actual constitutional violations, but also to craft prophylactic constitutional rules to prevent the significant risk of a constitutional violation." (Emphasis omitted.) *State* v. *Dickson*, 322 Conn. 410, 426 n.11, 141 A.3d 810 (2016), cert. denied, 582 U.S. 922, 137 S. Ct. 2263, 198 L. Ed. 2d 713 (2017); see, e.g., C. Rogers, "Putting Meat on Constitutional Bones: The Authority of State Courts To Craft Constitutional Prophylactic Rules Under the Federal Constitution," 98 B.U. L. Rev. 541, 545 (2018) (former Chief Justice of Connecticut Supreme Court explaining nature, scope, and purpose of court's power to adopt prophylactic rules). Prophylactic rules "are [forward-looking] and [have the potential to] either sanction future government conduct that is not expressly prohibited by the applicable constitutional provision or require future government conduct that the constitutional provision does not expressly mandate . . . ." C. Rogers, supra, 547. Because constitutional prophylactic rules have this potential to prohibit or to mandate what the constitution does not, their adoption is justified only when the risk of a constitutional violation is high, i.e., when the constitutional protections are "not by their terms readily applicable in the field"; (internal quotation marks omitted) id., 553; or when case-by-case analysis by the courts is inadequate due to the lack of "judicially manageable standards." Id., 554. Thus, "the authority . . . to create prophylactic rules is not without limits. To the contrary, there is general agreement that [courts] should use this authority cautiously and rules should be as narrowly tailored as possible to accomplish their purpose." Id., 565.

With this general background in mind, we turn to the defendant's claim that prosecutors are constitutionally

required to personally review the records that come to light during trial and, therefore, that we should adopt what he characterizes as a narrow prophylactic rule prohibiting prosecutors from enlisting the assistance of anyone other than the trial prosecutor himself to review such records in fulfilling their obligation under *Brady.* Specifically, the defendant asks this court "to adopt an additional layer of prophylaxis to prevent a significant risk of deprivation . . . of a defendant's due process rights under *Brady.*" (Citation omitted; internal quotation marks omitted.) In *Brady,* the United States Supreme Court held that "[t]he defendant has a right to the disclosure of exculpatory evidence under the due process [clause] of . . . [the fourteenth amendment to] the United States constitution . . . . In order to prove a *Brady* violation, the defendant must show: (1) that the prosecution suppressed evidence after a request by the defense; (2) that the evidence was favorable to the defense; and (3) that the evidence was material." (Citations omitted; internal quotation marks omitted.) *State* v. *Floyd,* 253 Conn. 700, 736–37, 756 A.2d 799 (2000). "It is well established that [i]mpeachment evidence as well as exculpatory evidence falls within *Brady*'s definition of evidence favorable to an accused." (Internal quotation marks omitted.) Id., 737. "Whether the [defendant] was deprived of his due process rights due to a *Brady* violation is a question of law, to which we grant plenary review." (Internal quotation marks omitted.) *Morant* v. *Commissioner of Correction,* 117 Conn. App. 279, 284, 979 A.2d 507, cert. denied, 294 Conn. 906, 982 A.2d 1080 (2009).

With respect to the defendant's specific claim in the present case, that a prosecutor be prohibited constitutionally from "delegat[ing]"[18] *Brady* review of informa-

[18] Although the defendant claims that the prosecutors in this case "delegated" their *Brady* obligations to someone who is not an attorney, and, although some of the case law uses "delegate" to describe similar situations, we think that it is an inaccurate and imprecise term. As we explain subsequently in this opinion, although prosecutors may, in appropriate situations, enlist the assistance of

tion discovered during trial to another, neither the defendant nor Justice Ecker, in his dissenting opinion, has pointed to a single case that prohibits a prosecutor from seeking assistance when material is reviewed to identify discoverable *Brady* information. Indeed, there is limited authority on this point. The authority that does exist regarding delegation suggests that delegation is not constitutionally prohibited. In fact, the defendant acknowledges that there is persuasive authority for the proposition that a prosecutor does not have a constitutional obligation to personally review materials in the government's possession to determine whether disclosure is required under *Brady*. See, e.g., *United States* v. *Jennings*, 960 F.2d 1488, 1491 (9th Cir. 1992) ("[w]e have never held that the prosecutor's obligations under *Brady* . . . require the personal effort demanded of the [prosecutor] by the [trial] court"); *United States* v. *Smith*, 552 F.2d 257, 262 (8th Cir. 1977) ("[i]t is unreasonable to impose [on] a prosecutor the duty of personally searching agency files for favorable evidence"); *Stacy* v. *State*, 500 P.3d 1023, 1038 (Alaska App. 2021) ("the [s]tate can comply with its obligations under *Brady* without having individual prosecutors personally review personnel files").[19]

---

certain nonlawyers to review records for potential *Brady* material, it is ultimately the nondelegable duty and responsibility of the *prosecutor* to disclose exculpatory material to the defense. To the extent other cases use the term "delegation," we understand it to be an imprecise, shorthand way of characterizing the enlistment of another to assist in the review of records for potential *Brady* material. When, and if, we do that in this opinion, we too use it as shorthand terminology.

[19] See also U.S. Dept. of Justice, Justice Manual, tit. 9, 9-5.002 (Step 2), available at https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings#9-5.002 (last visited June 11, 2024) ("It would be preferable if prosecutors could review the information [for *Brady* material] themselves in every case, but such review is not always feasible or necessary. . . . This process may involve agents, paralegals, agency counsel, and computerized searches. Although prosecutors may delegate the process and set forth criteria for identifying *potentially* discoverable information, prosecutors should not delegate the disclosure determination itself." (Emphasis in original.)).

The defendant does not claim that these cases were wrongly decided; nor does he challenge the constitutionality of a prosecutor's authority to seek assistance from another person for purposes of reviewing evidence for *Brady* material *before trial*. The defendant does claim, however, that, when potentially exculpatory material comes to light *during trial*, the prosecutor is uniquely qualified to determine whether the material contains exculpatory or impeachment evidence subject to disclosure under *Brady*. He therefore asks this court to adopt a federal constitutional, prophylactic rule requiring the prosecutor personally to review such material.

In support of this claim, the defendant relies on language in two United States Supreme Court cases suggesting that the determination as to whether information in the government's possession constitutes exculpatory or impeachment evidence is best made when the reviewer has access to the complete trial record. See *Kyles* v. *Whitley*, 514 U.S. 419, 439, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995) ("the character of a piece of evidence as favorable will often turn on the context of the existing or potential evidentiary record"); *United States* v. *Agurs*, 427 U.S. 97, 108, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976) (for purposes of determining whether material is disclosable under *Brady*, "the significance of an item of evidence can seldom be predicted accurately until the entire record is complete").[20] The defendant contends that *Whitley* and *Agurs* support the proposition that, when potential *Brady* material comes to light

[20] The defendant also relies on a number of cases holding that prosecutors are charged with the responsibility of determining whether evidence contains *Brady* material, an issue that is not in dispute. As the Appellate Court pointed out, and we agree, it does not follow from the fact that prosecutors are ultimately responsible for ensuring that all exculpatory evidence in the state's possession is disclosed to the defendant that prosecutors cannot seek assistance in complying with that responsibility. See *State* v. *Andres C.*, supra, 208 Conn. App. 859.

during trial, only the prosecutor, who has full knowledge of the substance and context of a witness' testimony, is in a position to determine whether the material constitutes impeachment evidence subject to *Brady*.

We do not disagree that familiarity with a witness' testimony is necessary to make a determination as to whether particular evidence is subject to disclosure under *Brady*. However, we do not agree that this fact requires us to adopt a prophylactic rule, under the federal constitution, requiring prosecutors personally to review potentially exculpatory information that comes to light during trial because we perceive no significant risk that, in the absence of such a prophylactic rule, the constitution will be violated. See, e.g., *State* v. *Dickson*, supra, 322 Conn. 426 n.11 (prophylactic rule is justified only when it will "prevent the significant risk of a constitutional violation" (emphasis omitted)).

First, the proposed new prophylactic rule is unnecessary and unwarranted because a sufficient safeguard already exists. Indeed, the law already recognizes that, when potentially exculpatory information comes to light during trial, if defense counsel requests production of the information and makes some showing that the specific information in question contains material, favorable evidence, and, if, after review by the prosecutor, the prosecutor claims that the information contains no evidence subject to disclosure under *Brady*, defense counsel can request an in camera review by the trial court. See, e.g., *United States* v. *Agurs*, supra, 427 U.S. 106 ("[a]lthough there is, of course, no duty to provide defense counsel with unlimited discovery of everything known by the prosecutor, if the subject matter of . . . a [specific *Brady*] request [made before or during trial] is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information *or by submitting the problem to the trial judge*" (emphasis

added)); *United States* v. *Prochilo*, 629 F.3d 264, 268–69 (1st Cir. 2011) (if defense counsel can "articulate with some specificity what evidence he hopes to find in the requested materials, why he thinks the materials contain this evidence, and finally, why this evidence would be both favorable to [the defense] and material," and government maintains that requested information is not disclosable under *Brady*, trial court can conduct in camera review of information); 6 W. LaFave et al., Criminal Procedure (4th Ed. 2015) § 24.3 (b), p. 447 ("[i]f the prosecutor refuses to respond to a specific pretrial request, stating that the material need not be disclosed under *Brady*, the defense may ask the trial court to examine the requested items in camera and order disclosure if it should find the items to be exculpatory and material"). Thus, if the defendant was unsatisfied with the prosecutor's representation that the journals did not contain any exculpatory evidence, defense counsel could have asked for in camera review by the trial court at that point, which counsel did not do. In camera review by the trial court of potentially exculpatory evidence certainly is adequate protection for the defendant's constitutional rights under *Brady*.[21]

[21] We recognize that defense counsel asked for an immediate in camera review of the journals for exculpatory material when their existence was disclosed at trial. The trial court's response was that the state had the obligation to review the journals for exculpatory information. The defendant did not claim before the trial court that the court incorrectly determined that review of the journals for *Brady* material was for the prosecutor in the first instance, he makes no such claim on appeal, and defense counsel did not renew his request for an in camera review after the prosecutor reported that the journals contained no exculpatory materials, with the possible exception of the short excerpt.

We further note that the defendant requests on appeal that, "if this court agrees that the prosecutors had the constitutional obligation to personally review the journals," and, "if further review of the journals is deemed necessary [to determine whether the trial court's failure to order the prosecutors to do so was harmful error] . . . this court [either] conduct the *Brady* review or remand the case [and order] that [the] prosecutors personally conduct that review." The defendant does not seek any alternative form of relief if this court should reject his contention that a prosecutor is constitutionally prohibited from delegating review. Accordingly, because we conclude that the prosecutor did not violate *Brady* by not personally reviewing

the journals, no further review is required. Thus, contrary to Justice D'Auria's suggestion in his concurring and dissenting opinion, there is no mystery as to the reason that we have not addressed his "practical" approach; the reason is that it was not raised on appeal.

The position of Justices Ecker and D'Auria, though billed as the "practical" approach by Justice D'Auria, essentially embarks down a path of review that has not been requested and is unwarranted. The cases cited by Justices Ecker and D'Auria to support the conclusion that a remand to the trial court for an in camera review is appropriate and necessary are inapposite. See *Pennsylvania* v. *Ritchie*, 480 U.S. 39, 43, 57, 107 S. Ct. 989, 94 L. Ed. 2d 40 (1987); *United States* v. *Stillwell*, 986 F.3d 196, 200–201 (2d Cir. 2021); *United States* v. *Djibo*, 730 Fed. Appx. 52, 55–56 (2d Cir. 2018); *United States* v. *Alvarez*, 358 F.3d 1194, 1209 (9th Cir.), cert. denied sub nom. *Valenzuela* v. *United States*, 543 U.S. 887, 125 S. Ct. 126, 160 L. Ed. 2d 148 (2004); *United States* v. *Rosario-Peralta*, 175 F.3d 48, 56–57 (1st Cir. 1999); *United States* v. *Griggs*, 713 F.2d 672, 674 (11th Cir. 1983); *United State*s v. *Dansker*, 537 F.2d 40, 65 (3d Cir. 1976), cert. denied, 429 U.S. 1038, 97 S. Ct. 732, 50 L. Ed. 2d 748 (1977), and cert. denied sub nom. *Valentine* v. *United States*, 429 U.S. 1038, 97 S. Ct. 732, 50 L. Ed. 2d 748 (1977), and cert. denied sub nom. *Diaco* v. *United States*, 429 U.S. 1038, 97 S. Ct. 732, 50 L. Ed. 2d 748 (1977); *State* v. *Pollitt*, 199 Conn. 399, 406–407, 415–16, 508 A.2d 1 (1986); *State* v. *Gonzales*, 186 Conn. 426, 435–36, 441 A.2d 852 (1982). Put simply, these cases are distinguishable because, in each of them, the defendant claimed on appeal either that the government had refused the defendant's request to review specific evidence for *Brady* material, or that the defendant became aware of undisclosed evidence that was subject to disclosure under *Brady* during or after trial. This is not the case here.

For the same reason, Justice D'Auria's reliance on this court's decision in *State* v. *Floyd*, supra, 253 Conn. 732, as support for his suggestion that we remand the case to the trial court to order the translation of the journals and for further fact-finding is misplaced. See part IV of the concurring and dissenting opinion. *Floyd* involved the discovery of potential *Brady* material posttrial, while the defendant's appeal was pending. See *State* v. *Floyd*, supra, 730. Subsequent to *Floyd*, this court has made clear that "[w]e will order a *Floyd* hearing to develop a potential *Brady* violation only in the unusual situation in which a defendant was precluded from perfecting the record due to new information obtained after judgment." (Internal quotation marks omitted.) *State* v. *Ortiz*, 280 Conn. 686, 713 n.17, 911 A.2d 1055 (2006).

As we explained, in the present case, the trial court ordered the state to review the journals for *Brady* material, and that review occurred with the full knowledge of the defendant as to exactly how that review was going to take place; there was no refusal to review the journals. Following the review, there was no request for additional relief that the trial court denied. And the defendant has not identified on appeal any evidence that was subject to *Brady* that the state failed to disclose. The defendant's only claim on appeal is that the prosecutor herself was required to conduct the review. Notwithstanding the insistence to the contrary by Justices D'Auria and Ecker, the defendant does not seek—and the state does not acquiesce in— any additional form of relief should we reject this nondelegation claim. To

Second, the defendant's request is shortsighted. It assumes that only the prosecutor handling the trial will have the requisite familiarity with the trial proceedings and ignores the fact that very experienced individuals other than the trial attorney may possess that familiarity. For example, under the defendant's proposed rule, a highly experienced paralegal who has been trained in the requirements of *Brady* and who sat by the prosecutor's side during the entire trial, or a supervising prosecuting attorney who had been supplied with the transcript of the proceedings, could not conduct a *Brady* review. Moreover, a rule that required the trial prosecutor personally to conduct a *Brady* review might result in extraordinary delays in the trial, depending on the volume of records to be reviewed.

Third, courts may adopt constitutional prophylactic rules only when "the risk of a constitutional violation is sufficiently great that simple case-by-case enforcement of the core right is insufficient to secure that right . . . ." (Footnotes omitted; internal quotation marks omitted.) C. Rogers, supra, 98 B.U. L. Rev. 547. Case-by-case enforcement is inadequate only when constitutional protections are "not by their terms readily applicable in the field"; (internal quotation marks omitted) id., 553; or when there is an absence of "judicially manageable standards." Id., 554. In the present case, the defendant has pointed to no evidence that prosecutors or courts are experiencing difficulty in determining in particular cases whether a person is qualified to conduct a *Brady* review. But cf. id. (before United States Supreme Court's adoption of prophylactic rule in *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d

the extent that Justices D'Auria and Ecker rely on the defendant's contention that, if this court were to agree with his nondelegation claim (which we do not), a *Brady* violation must exist because the nondisclosed portions of the journals necessarily contain impeaching or exculpatory information, we disagree with that contention. See footnote 14 of this opinion.

694 (1966), "[c]ourts had struggled to determine whether confessions were voluntary or whether, instead, a defendant's will was overborne" (internal quotation marks omitted)). Thus, there is no reason to believe that case-by-case enforcement is inadequate. If a defendant challenges the qualifications of the person who conducted the *Brady* review, and the trial court finds that the person was unqualified, it can order review by a qualified person. See, e.g., *Batarfi* v. *Bush*, 602 F. Supp. 2d 118, 120 (D.D.C. 2009) (instructing government that "[a]ny delegation of a review for exculpatory evidence to attorneys who do not understand or are not familiar with *Brady* and its progeny . . . is absolutely unacceptable and will not be tolerated"). Courts also have the authority to dismiss the charges in egregious cases[22] or to refer the prosecutor for disciplinary proceedings.[23]

Although the defendant in the present case argues, in support of his proposed prophylactic rule, that, on the basis of the record, this court cannot have "confidence

---

[22] See, e.g., *Virgin Islands* v. *Fahie*, 419 F.3d 249, 254–55 (3d Cir. 2005) ("dismissal for a *Brady* violation may be appropriate in cases of deliberate misconduct because those cases call for penalties [that] are not only corrective but are also highly deterrent").

[23] A prosecutor who fails to comply with his or her ethical obligation to disclose exculpatory and mitigating evidence to the defendant may be referred to professional disciplinary proceedings and subject to sanctions. See *In re Kurtzrock*, 192 App. Div. 3d 197, 209, 213–15, 221, 138 N.Y.S.3d 649 (2020) (granting motion to confirm prosecutor's suspension from practice of law for two years after he removed favorable materials from disclosed files and neglected, in several instances, to make any effort to comply with rule of professional conduct requiring him to disclose to defendant all information known to prosecutor "that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the sentence"); see also Rules of Professional Conduct 3.8 (4) (prosecutor shall "[m]ake timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense"); *Kyles* v. *Whitley*, supra, 514 U.S. 437 (*Brady* "requires less of the prosecution than the [American Bar Association] Standards for Criminal Justice, which call generally for prosecutorial disclosures of any evidence tending to exculpate or mitigate").

that the investigator [who conducted the *Brady* review] was properly instructed about *Brady*'s requirements," he has not expressly raised a freestanding claim that, even if this court should reject his request for a prophylactic rule categorically barring the prosecutor from delegating *to anyone Brady* review of records that come to light during trial, we should find that this particular delegation was improper. The defendant's decision not to raise this claim on appeal is probably for good reason: he did not raise the issue of the adequacy of the investigator's legal training in the trial court, and, therefore, there are no factual findings concerning the issue. There also are no factual findings as to whether the investigator had sufficient knowledge of the facts of this case and the nature of the complainant's testimony to conduct a *Brady* review. Thus, if the defendant had made that unpreserved claim on appeal, the record would be inadequate for review of those issues. Unlike Justice Ecker, we decline to draw negative conclusions regarding the investigator's background from an incomplete and inadequate record.[24]

---

[24] Justice Ecker would have us misapply *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015), by addressing a claim that the defendant has not raised on appeal, namely, that, even if the prosecutor was not constitutionally required to personally review the journals, this particular investigator was unqualified to do so. See part II of the dissenting opinion. Even if the defendant had raised that claim, the record would be inadequate for review under the first prong of *Golding*. See, e.g., *State* v. *Brunetti*, 279 Conn. 39, 53, 58, 63–64, 901 A.2d 1 (2006) (under first prong of *Golding*, record was inadequate to review defendant's claim that consent of both present joint occupants of premises is necessary for search when issue of one occupant's consent was not before trial court, and, therefore, facts relevant to that occupant's consent were not adduced), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007). Because the defendant has not raised that claim on appeal, we need not consider whether we should adopt an exception to the *Golding* requirement of an adequate record for review in cases in which the defendant has failed to claim before the trial court that the person who conducted the *Brady* review was unqualified to do so and remand such cases to the trial court for further factual findings on the issue. But cf. *State* v. *Ortiz*, 280 Conn. 686, 713 n.17, 911 A.2d 1055 (2006) ("[w]e will order a *Floyd* hearing to develop a potential *Brady* violation only in the unusual situation in which a defendant was precluded from perfecting the record

Although we reject the defendant's request for a constitutional prophylactic rule requiring prosecutors to personally review evidence that comes to light during trial for *Brady* material, we recognize that, when a prosecutor obtains assistance from another person for purposes of reviewing material for potential *Brady* information, and that person fails to identify information that is, in fact, subject to *Brady*, it is possible that that information may *never* come to light. Accordingly, we pause here to reiterate and emphasize "the unique responsibilities of the prosecutor in our judicial system. A prosecutor is not only an officer of the court, like every other attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent." (Internal quotation marks omitted.) *State* v. *Stevenson*, 269 Conn. 563, 571–72, 849 A.2d 626 (2004); see, e.g., Rules of Professional Conduct 3.8, commentary ("[a] prosecutor has the responsibility of a minister of justice and not simply that of an advocate"). As the United States Court of Appeals for the Ninth Circuit stated in *United States* v. *Alvarez*, 86 F.3d 901 (9th Cir. 1996), cert. denied, 519 U.S. 1082, 117 S. Ct. 748, 136 L. Ed. 2d 686 (1997), "[b]ecause the government's failure to turn over exculpatory information in its possession is unlikely to be discovered and thus largely unreviewable, it is particularly important for the prosecutor to ensure that a careful and proper *Brady* review is done. Delegating the responsibility to a nonattorney police investigator to review his own and other officers' rough notes to determine whether they contain *Brady* . . . information is clearly problematic. Although we have held that the [trial] court cannot order [a prosecutor] personally to review law enforcement personnel files . . . we see little justification and much danger to both the prosecutor's reputation and the quality of justice her office serves for a prosecutor not to review

due to new information obtained after judgment" (internal quotation marks omitted)).

personally those materials directly related to the investigation and prosecution of the defendants, such as a testifying officer's surveillance notes." (Citations omitted.) Id., 905.

Indeed, it is the obligation of the prosecutor, not the defendant or the courts, to ensure, in the first instance, that the principles of justice that underlie *Brady* are fully served. See, e.g., *United States* v. *Jennings*, supra, 960 F.2d 1490 (prosecutor "is responsible for compliance with the dictates of *Brady* and its progeny"); *United States* v. *Cadet*, 727 F.2d 1453, 1467 (9th Cir. 1984) ("[t]he prosecutor's oath of office, not the command of a federal court, should have compelled the government to produce any favorable evidence in the personnel records"). We therefore believe that, regardless of when the state becomes aware of potentially exculpatory information or how the information comes to light, it is the better practice for prosecutors personally to review the information, or at least to seek assistance from attorneys, or other qualified staff members, who have received comprehensive training in the requirements of *Brady* and who are sufficiently knowledgeable about the case, including possible defenses, to appreciate the import of the information under review.

We emphasize that the review for *Brady* material is quintessentially a prosecutor's role, and the prosecutor bears ultimate responsibility for compliance with *Brady*. See, e.g., General Statutes § 54-86c (a) ("the state's attorney, assistant state's attorney or deputy assistant state's attorney in charge of the case shall disclose any exculpatory information or material which he may have with respect to the defendant whether or not a request has been made therefor"); accord Practice Book § 40-11 (b). For example, the United States Department of Justice policies and procedures provide that "prosecutors must ensure that the material is reviewed to identify discoverable [*Brady*] information. It would be preferable if prosecutors could review the information themselves in every case, but such review is not always feasible

or necessary. *The prosecutor is ultimately responsible for compliance with discovery obligations.* . . . Because the responsibility for compliance with discovery obligations rests with the prosecutor, the prosecutor's decision about how to conduct this review is controlling. This process may involve agents, paralegals, agency counsel, and computerized searches. Although prosecutors may delegate the process and set forth criteria for identifying potentially discoverable information, *prosecutors should not delegate the disclosure determination itself.*" (Emphasis altered.) U.S. Dept. of Justice, Justice Manual, tit. 9, 9-5.002 (Step 2), available at https://www.justice.gov/jm/jm-9-5000-issues-related-trials-and-other-court-proceedings#9-5.002 (last visited June 11, 2024).

Similarly, the Connecticut Division of Criminal Justice recognizes the central role the prosecutor plays in the *Brady* process: "The prosecutor is deemed to possess all favorable evidence, and is deemed to know if any member of the prosecution team possesses favorable evidence, even if the prosecutor does not have actual possession or knowledge of that favorable evidence." Office of the Chief State's Attorney, Connecticut Division of Criminal Justice Policies and Procedures (July, 2022) Policy 512a (Policy Regarding Disclosure of Exculpatory & Impeachment Evidence), p. 2. We have recognized as much. See *Demers* v. *State*, 209 Conn. 143, 153, 547 A.2d 28 (1988) (collective knowledge of entire prosecution team imputed to prosecutor).

With respect to voluminous discovery material, in order to avoid an inadvertent failure to disclose *Brady* material, "prosecutors may discharge their disclosure obligations by choosing to make the voluminous information available to the defense." U.S. Dept. of Justice, supra, 9-5.002 (Step 1); see id. (Step 3) ("[p]rosecutors are encouraged to provide broad and early discovery consistent with any countervailing considerations"); see also id. (Step 2) ("[i]n cases involving voluminous evidence obtained from third parties, prosecutors should consider providing defense access to

the voluminous documents to avoid the possibility that a well-intentioned review process nonetheless fails to identify material discoverable evidence"). In sum, a prosecutor may seek assistance in reviewing discovery for potential *Brady* material from someone with competency and an understanding of the full scope of the prosecutor's responsibility under *Brady*. That individual also must have an understanding of the specific details of the case. The prosecutor himself, however, remains constitutionally, professionally and ethically accountable for that individual's performance.

As we explained, the defendant has not expressly raised a freestanding claim that the particular delegation of *Brady* review in this case was improper because the investigator was not adequately trained to conduct a review for *Brady* material or was not sufficiently familiar with the facts of the case. Indeed, when the prosecutor informed the trial court that a Spanish-speaking investigator would conduct the review, the defendant and his counsel did not object to this approach and agreed that a translation was not necessary.[25] See footnotes 4 and 21 of this opinion. Because prosecutors have no constitutional obligation personally to conduct a review for *Brady* material that comes to light during trial, we conclude that the Appellate Court correctly determined that the prosecutor was not constitutionally required to personally review the complainant's journals for *Brady* material.[26]

---

[25] In any event, the focus of Justices D'Auria and Ecker on obtaining a translation misses the point. In fact, the defendant barely mentions the lack of a translation in his briefs to this court, which is not surprising given his and defense counsel's agreement in the trial court that a translation was not necessary. In the end, it is not the translation that is at the crux of the question here but, rather, the review for *Brady* material. We *have rejected* the defendant's claim that a prosecutor cannot ask a qualified individual to conduct a *Brady* review of evidence that comes to light during trial. Thus, delegation is not constitutionally prohibited regardless of whether the records are in English, and translation of the journals into English would not resolve our disagreement with Justices D'Auria and Ecker over who is required to review them.

[26] Justice Ecker would go much farther and, relying on *Kyles* v. *Whitley*, supra, 514 U.S. 437–48, concludes that the individual prosecuting attorney or a trained attorney on the prosecution team has an obligation, not just to

Justice Ecker concludes in his dissent that, to the contrary, "the investigator's review of the complainant's journals for *Brady* material was not constitutionally adequate, and, therefore, the journals were suppressed . . . within the meaning of *Brady*." Part II of the dissenting opinion. To the extent that Justice Ecker concludes that the particular investigator who conducted the *Brady* review did not possess the legal training and knowledge required to conduct a *Brady* review and was unqualified to translate the journals, as we already explained, the defendant has not raised any such claim on appeal. The defendant also did not raise any such claim before the trial court, and, consequently, there are no factual findings concerning this issue.[27] It is

disclose exculpatory evidence, but also to personally review at least certain evidence to fulfill the disclosure obligation. See part II of the dissenting opinion. The problem is that the United States Supreme Court nowhere in *Kyles* sets forth such a review requirement. Rather, the statements from *Kyles* relied on by Justice Ecker were made in response to the argument that a prosecutor is not responsible for disclosing exculpatory or impeachment material in the hands of the police that the prosecutor does not know about. See *Kyles* v. *Whitley*, supra, 438. The Supreme Court in *Kyles* confirmed that the prosecutor is responsible under *Brady* for any failure to disclose exculpatory evidence to the defense, even if the police have not revealed the evidence to the prosecutor. See id., 437–38. The ultimate responsibility for disclosure rests with the prosecutor. See id.

[27] Justice Ecker asserts that, when the prosecutor gave four pages of the journals to the trial court for an in camera review, she represented to the trial court that they did not contain *Brady* material "but, instead, were subject to in camera review under . . . § 54-86f (a) [the rape shield statute] because they involved evidence of the complainant's sexual conduct." Footnote 21 of the dissenting opinion. Justice Ecker contends that "one of those pages contained *Brady* material that went unrecognized and unacknowledged by the prosecutors," and this fact "demonstrates conclusively" that the prosecutor herself was unable to recognize *Brady* material. Id. In turn, Justice Ecker contends, this "casts doubt on the propriety of delegating that responsibility to a nonlawyer instructed by the prosecutors . . . ." Id. We disagree.

It is true that, before disclosing the four pages to the trial court for review, the prosecutor stated that the material was not exculpatory and that defense counsel was not entitled to cross-examine the complainant on that material, which involved an account of prior sexual conduct that the complainant later testified was counterfactual, because the four pages were protected by § 54-86f, the rape shield statute.

We acknowledge that the prosecutor's statement that the excerpts from the journals were not subject to *Brady* is somewhat confounding. The rape shield statute created no obligation for the prosecutor to disclose evidence

axiomatic that appellate courts cannot find facts in the first instance. See, e.g., *Gianetti* v. *Norwalk Hospital*, 266 Conn. 544, 560, 833 A.2d 891 (2003). Thus, the record is inadequate for review. Indeed, had the state known that the investigator's qualifications would be subject to scrutiny on appeal, it might have sought to present additional ones.

of the complainant's sexual conduct to the defendant. Rather, the statute provides that evidence of the complainant's sexual conduct is inadmissible unless that evidence is subject to one of the statutory exceptions. For purposes of this case, the relevant exceptions are set forth in subdivision (2) of § 54-86f (a), which provides that such information is admissible on the issue of a complainant's credibility if the complainant has testified on direct examination as to his or her sexual conduct, and in subdivision (4) of § 54-86f (a), which provides that the information is admissible if it is "so relevant and material to a critical issue in the case that excluding it would violate the defendant's constitutional rights." We have recognized that subdivision (4) contemplates a *Brady* review. See *Demers* v. *State*, supra, 209 Conn. 160 (evidence that is subject to *Brady* is subject to exception set forth in what is now § 54-86f (a) (4)).

Whatever the prosecutor's reason may have been for providing the excerpts to the trial court, it is clear that the court understood that it was reviewing them for *Brady* material. After the prosecutor provided the excerpts to the trial court, although the court initially stated that "the state [is] not ask[ing] [it] to review [the excerpts] for *Brady* material" but was requesting review pursuant to the rape shield statute, the court then immediately observed that "the [rape shield] statute authorizes the [prosecutor] to ask a judge to review [evidence subject to the statute for] potential *Brady* material to determine whether it was in fact exculpatory and should be turned over to the defendant," and asked the parties whether it should refer the matter to another judge to make that determination. Shortly thereafter, the trial court again observed that, under the rape shield statute, "certain material . . . should be turned over to the defendant," and asked the parties a second time whether they objected to the court's reviewing the excerpts for such material. The parties agreed that the trial court could conduct the review. We further note that the trial court earlier explained to the state its obligation by stating that, "if there's anything that the state is uncertain as to whether it's exculpatory, [it] can provide those portions of the journals to [the court], and [it] will review them in camera to determine whether they should be disclosed to defense counsel."

Thus, although the prosecutor's statement that the four pages contained no *Brady* material was not correct, because the trial court conducted the *Brady* review after the prosecutor asked the trial court to conduct an in camera review, and the defendant received the information to which he was constitutionally entitled, we decline to draw the inference that other aspects of the *Brady* review were inadequate. Furthermore, even if the prosecutor may have made a mistake in her *Brady* analysis as to one document, that would not demonstrate conclusively that she did not understand her obligations under *Brady*. Finally, we again note that the defendant, after learning that there was at least one page of exculpatory material in the journals, never asked the court to conduct a further in camera review of the journals for additional *Brady* material.

To the extent that Justice Ecker suggests that *no one* but the prosecutor constitutionally could perform the *Brady* review under the circumstances present here, for the reasons set forth previously, we cannot agree. Justice Ecker cites numerous authorities for the propositions that the ultimate responsibility for complying with *Brady* rests with the prosecutor and that compliance with *Brady* requires specialized legal training and the exercise of judgment— propositions with which we have no quarrel. But neither Justice Ecker nor the defendant has cited, and our research has not revealed, a single case in which a court has concluded that the government violated *Brady* merely because the records at issue were not personally reviewed by the prosecutor.[28] No such prophylactic rule is necessary because a case-by-case review and the available judicial standards adequately protect a defendant's constitutional rights. To be sure, the defendant was free to challenge the qualifications of the investigator to conduct the *Brady* review at trial or to ask the trial court for an in camera review *after* the prosecutor indicated that, with the exception of the short excerpt, the journals contained no *Brady* material. We therefore decline to adopt a gratuitous *Brady* requirement that no other court has recognized simply as a hook on which to hang relief that would not have been necessary if the defense had taken advantage of adequate existing procedures.

The judgment of the Appellate Court is affirmed.

In this opinion ROBINSON, C. J., and McDONALD, DANNEHY and BRIGHT, Js., concurred.

---

[28] Contrary to Justice Ecker's contention that the review here resulted in suppression; see footnote 25 of the dissenting opinion; as the state points out, the defendant does not claim that the state "suppressed" favorable information in violation of *Brady*, which is ordinarily an element of a *Brady* claim; see, e.g., *State* v. *Floyd*, supra, 253 Conn. 736; but claims only that the procedure that the state used to review the journals was constitutionally inadequate. Although the state is correct, we underscore that, in order to ensure a meaningful review for exculpatory material, *Brady* requires that the person conducting the review be knowledgeable about "the meaning of exculpatory evidence and the principles set forth in *Brady* . . . ." (Citation omitted.) *Batarfi* v. *Bush*, supra, 602 F. Supp. 2d 119–20; as well as the facts of the case being prosecuted.